In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3381

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAWRENCE D. ADKINSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:14-cr-00025-2 — **Tanya Walton Pratt**, *Judge.*

ARGUED JANUARY 23, 2019 — DECIDED FEBRUARY 14, 2019

Before WOOD, *Chief Judge*, and KANNE, and ST. EVE, *Circuit Judges*.

PER CURIAM. Lawrence Adkinson, Jeffrey Kemp, Paul Grissom, and Justin Martin (all of whom are appellants in this consolidated appeal) were prosecuted for robbing T-Mobile and other cellphone stores. Adkinson, who is African-American, challenges two of the district court's pretrial rulings. The first ruling denied his motion to transfer the case to a venue where he potentially would have had more African-American

jurors on the venire. The second ruling denied his motion to suppress information that T-Mobile gave to law enforcement about the approximate location of his cellphone during the robberies. Because the district court did not abuse its discretion in denying Adkinson's motion to transfer venue, nor violate his Fourth Amendment rights by admitting certain cell-site location information, we affirm the judgment against Adkinson. We address the other defendants' appeals in a separate order.

## I. Background

Adkinson and others, in July 2015, robbed a T-Mobile phone store in Clarksville, Indiana, and then a Verizon store in Kentucky the next day. With handguns drawn, they stole approximately 100 cell phones and other items. They later robbed nine additional stores, including three more T-Mobile stores.

T-Mobile investigated the first robberies. As part of its investigation, T-Mobile conducted "tower dumps": it pulled data from cell sites near the first two victim stores to identify which phones had connected to them—and thus were close to the crimes. From these dumps, T-Mobile determined that only one T-Mobile phone was near both robberies and that Adkinson was an authorized user on that phone's account. Each time a phone connects to any cell site, it also generates a time-stamped record known as cell-site location information. From its records, T-Mobile determined where Adkinson's phone traveled. It went from Chicago to the Indiana-Kentucky border, approached the Verizon store the day it was robbed, and returned to Chicago that evening. T-Mobile voluntarily gave

this data to the FBI. The record does not reflect whether T-Mobile did so on its own or at the FBI's request. T-Mobile delivered similar data after two more of its stores were robbed.

T-Mobile's privacy policy allowed T-Mobile to disclose information about its phones' users. It may do so "[t]o satisfy any applicable … legal process or enforceable governmental request" or "[t]o protect [its] rights or interests, property or safety or that of others." Law enforcement used the information from T-Mobile to obtain a court order under the Stored Communications Act, 18 U.S.C. § 2703, granting the FBI access to additional cell-site data.

The government charged Adkinson in the Southern District of Indiana, New Albany Division (which encompasses Clarksville). Before his trial, Adkinson brought two motions relevant to this appeal. First, he moved to suppress "any and all evidence obtained through cellphone records and/or triangulation of cellphone numbers" because, he argued, the government obtained it without a warrant, in violation of the Fourth Amendment. The district court denied the motion. It ruled that T-Mobile was not the government's agent when it transmitted Adkinson's location data, and Adkinson had consented to T-Mobile's cooperation with the government, so no Fourth Amendment violation had occurred.

The second motion concerned venue. The district court set a pretrial motion deadline to file change of venue motions. Adkinson did not timely file such a motion. Instead, on the morning of trial, after observing that only one African-American prospective juror was on the jury venire, Adkinson moved during voir dire to transfer the case to a venue with "a better pool of African Americans," like Indianapolis. *See* FED.

R. CRIM. P. 12(b)(3)(A)(i), 21. Although the court was sympathetic to the basis for the motion, the court observed that Adkinson's morning-of-trial motion was "extremely untimely" (it was due a month earlier), and denied it. The court further noted that Adkinson could have obtained the racial composition of the judicial division—about one percent African American—well in advance of trial. The government added that the population in the Indianapolis Division of the Southern District of Indiana was only four-percent African American, and the court agreed, adding that many of the counties in that division had "very sparse" African-American populations. Indeed, Adkinson acknowledged during oral argument that there "is not a significantly larger minority population" in the Indianapolis Division than there is in the New Albany Division.

A jury convicted Adkinson of conspiracy to commit robbery, 18 U.S.C. § 1951(a), conspiracy to brandish a firearm to further a crime of violence, *id*. § 924(o), robbery, *id*. § 1951(a), and brandishing a firearm to further a crime of violence, *id*. § 924(c). The district court sentenced him to 346 months in prison.

## II. Discussion

### A. Motion to Change Venue

On appeal, Adkinson first challenges the district court's denial of his motion to change venue. He argues that the nearly all-white jury pool subjected him to "the substantial risk of implicit racial bias." We review the district court's ruling for an abuse of discretion. *United States v. Jordan*, 223 F.3d 676, 685–86 (7th Cir. 2000).

The district court did not abuse its discretion in denying Adkinson's motion because, regardless of his arguments regarding the emerging science on implicit bias, the Constitution does not entitle a defendant to a venire of any particular racial makeup. *See Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *see also United States v. Stephens*, 514 F.3d 703, 709 (7th Cir. 2008) ("[A] defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race.'") (quoting *Powers v. Ohio*, 499 U.S. 400, 404 (1999) (alteration in original)). Adkinson's attempt to create a presumption of implicit racial bias based on the racial composition of the jury venire fails. To the extent Adkinson subjectively worried about implicit bias, voir dire was the appropriate vehicle to address it.

Furthermore, federal law authorized the government to prosecute Adkinson in any district where he offended. 18 U.S.C. § 3237(a); FED. R. CRIM. P. 18. Adkinson committed the first robbery in Clarksville, Indiana, and the government prosecuted him in the corresponding division. Once there, the Sixth Amendment entitled Adkinson to a venire that was a fair cross section of the community and from which the government did not intentionally exclude anyone based on race. *See Taylor*, 419 U.S. at 538. Adkinson does not dispute that he received this. In fact, the African-American who was in the venire served on the jury.

Adkinson had the opportunity to tease out any potential juror bias during voir dire, *see United States v. Nettles*, 476 F.3d 508, 514 (7th Cir. 2007), and he has never asserted that any of the jurors in his case actually exhibited bias or that he was prejudiced in any way. In *United States v. Fox*, 878 F.3d 574, 578 (7th Cir. 2017), and *United States v. Sinclair*, 770 F.3d 1148,

1155–56 (7th Cir. 2014), we affirmed the denial of the defend-
ants' eve-of-trial motions to change counsel, reasoning that
the cost and inconvenience to the jurors and witnesses out-
weighed the "pure conjecture" that the defendants would
successfully retain new representation. Like the defendants in
*Fox* and *Sinclair*, Adkinson only speculates that he would
have had a more diverse jury pool in the Indianapolis Divi-
sion.

Finally, Adkinson's motion came too late because Adkin-
son did not abide by the court's schedule and offered no rea-
son for his tardiness or failure to comply with the district
court's pretrial scheduling order. *See* FED. R. CRIM. P. 12(c)(3);
*United States v. Suggs*, 703 Fed. Appx. 425, 426 (7th Cir. 2017)
(holding that district court did not abuse its discretion in de-
clining to consider an untimely motion).

### B. Motion to Suppress Cell-Site Data

Adkinson next argues that the district court erroneously
denied his motion to suppress the cell-site data that T-Mobile
collected. The district court denied the motion to suppress be-
cause T-Mobile was not acting as a government agent when it
collected and shared the data with law enforcement, and be-
cause Adkinson did not have a reasonable expectation of pri-
vacy in his location. At oral argument, Adkinson clarified that
he is principally challenging the court's ruling regarding the
data collected from the tower dumps, rather than the cell-site
location information because the government obtained the
cell-site information pursuant to a court order. His argument
relies heavily on the Supreme Court's recent decision in *Car-
penter v. United States*, 138 S. Ct. 2206 (2018). In *Carpenter*, the
Supreme Court held that the government may not, without a

warrant supported by probable cause, compel a cellular service company to search for and supply the data that its cell sites reveal about a user's past movements. *Id*. at 2221. Adkinson asserts that, even though the record does not show that the government compelled T-Mobile to provide its data, as a "public utility replacement," T-Mobile is a "de facto government agent." Therefore, he concludes, its collection of this data without a warrant violated the Fourth Amendment.

The government responds that the Fourth Amendment was not violated, and we agree for three primary reasons. First, T-Mobile is a private party, and Adkinson has not shown that it was the government's agent. "A search or seizure by a private party does not implicate the Fourth Amendment" unless the private party "is acting as an instrument or agent of the government." *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997) (internal quotation omitted). To demonstrate agency, Adkinson must establish either that T-Mobile agreed to act on the government's behalf and to be subject to its control or that the government ratified T-Mobile's conduct as its own. *United States v. Aldridge*, 642 F.3d 537, 541 (7th Cir. 2011) (citing RESTATEMENT (THIRD) OF AGENCY §§ 1.01, 4.01 (2006)). T-Mobile, however, acted in its own interest to prevent more robberies of its stores and recover its property when the company furnished data to the government; there is no evidence that it expected to receive any benefit from the government. Providing that data did not transform T-Mobile into an agent of the state. *See Shahid*, 117 F.3d at 326. Nor is T-Mobile, as a carrier of cellular service, a government agent simply because it is part of that industry. *See United States v. Koenig*, 856 F.2d 843, 847–48 (7th Cir. 1988). And the government's mere receipt of T-Mobile's data is not a ratification of

T-Mobile's conduct. *See Coolidge v. New Hampshire*, 403 U.S. 443, 489–90 (1971); *Aldridge*, 642 F.3d at 541–52.

Second, regardless of agency, Adkinson's Fourth Amendment rights were still not violated because Adkinson consented to T-Mobile collecting and sharing his cell-site information. A defendant can voluntarily consent in advance to a search as a condition of receiving contracted services. *See Medlock v. Trustees of Indiana Univ.*, 738 F.3d 867, 872 (7th Cir. 2013). As a condition of using a phone serviced by T-Mobile, Adkinson agreed to T-Mobile's policy that T-Mobile could disclose information when reasonably necessary to protect its rights, interests, property, or safety, or that of others. And T-Mobile, in accordance with its policy, shared information with law enforcement after one of its stores was robbed at gunpoint.

Third, *Carpenter* itself does not help Adkinson. The case did not invalidate warrantless tower dumps (which identified phones near *one location* (the victim stores) at *one time* (during the robberies)) because the Supreme Court declined to rule that these dumps were searches requiring warrants. 138 S. Ct. at 2220. Adkinson also relies on policy guidance from the Department of Justice about cell-site data. But that policy guidance, by its own terms, "is not intended to and does not create any right, benefit, trust, or responsibility."

Finally, even if Adkinson sought to challenge the cell-site location data that the government later collected through the order it obtained under the Stored Communications Act, the challenge would be meritless. Adkinson did not challenge the admission of such data below and cannot do so now. As in *Thomas*, "though the Supreme Court's *Carpenter* decision indicates a potential Fourth Amendment problem with the cell-

site data used here, [Adkinson] cannot raise this argument now, after failing to raise it in the district court." *United States v. Thomas*, 897 F.3d 807, 815 (7th Cir. 2018). He has not attempted to show good cause and *Thomas* suggests the intervening *Carpente*r decision would not constitute good cause. In any event, the good-faith exception to the exclusionary rule would apply. *See United States v. Curtis*, 901 F.3d 846, 849 (7th Cir. 2018). Law enforcement reasonably relied on settled law that the information from T-Mobile was proper, and the Supreme Court had not yet decided *Carpenter* when the government received the information.

### III. Conclusion

The judgment of the district court is **AFFIRMED**.