NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1399-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

PHILLIP D. BRYANT and
JAMES HUNTER,

    Defendants-Appellants.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 4, 2025**
>
> **APPELLATE DIVISION**

Argued September 9, 2025 – Decided December 4, 2025

Before Judges Gilson, Firko, and Perez Friscia.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 22-02-0124.

Sidney W. Thaxter (Fourth Amendment Center of the National Association of Criminal Defense Lawyers) of the New York bar, admitted pro hac vice, argued the cause for appellant Phillip D. Bryant (Jennifer N. Sellitti, Public Defender, attorney; Alison Perrone, Appellate Deputy/Assistant Public Defender and Sidney W. Thaxter, on the briefs).

Tamar Y. Lerer, Deputy Public Defender, argued the cause for appellant James Hunter (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Anthony J. Robinson, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Anthony J. Robinson and Elizabeth K. Gibbons, Assistant Prosecutor, of counsel and on the briefs).

Steven A. Yomtov, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Steven A. Yomtov, of counsel and on the brief).

Dillon Reisman argued the cause for amici curiae American Civil Liberties Union Foundation and American Civil Liberties Union of New Jersey Foundation (American Civil Liberties Union of New Jersey Foundation, attorneys; Dillon Reisman, Ezra D. Rosenberg, Jeanne LoCicero, and Jennifer Stisa Granick (American Civil Liberties Union Foundation) of the California bar, admitted pro hac vice, on the brief).

The opinion of the court was delivered by

GILSON, P.J.A.D.

Two men invaded a home, robbed a family, and one of the men sexually assaulted a woman who lived at the home. Through investigations, which included warrants to obtain data from cell towers around the home, law enforcement personnel identified defendants James Hunter, Phillip Bryant, and Wayne Smith as suspects. Thereafter, a grand jury indicted defendants for twenty-four crimes, including multiple counts of first-degree robbery, N.J.S.A.

2C:15-1(a), and two counts of first-degree aggravated sexual assault against Hunter, N.J.S.A. 2C:14-2(a)(3) and (4).

Defendants Hunter and Bryant moved to suppress the evidence obtained from the four warrants arguing that "tower dump warrants" are unconstitutional searches. We hold that governmental requests for data from cell towers are searches and require a warrant. We further hold that those warrants must be supported by probable cause and must be particularized in the information they seek. Four of the warrants issued in this matter were not particularized because they sought identifying information about thousands of cell phone users who were clearly not involved with the robbery or assault. Therefore, those warrants were unconstitutional under both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution.

Nevertheless, we also hold that the information identifying defendants would have inevitably been discovered through lawful means. Consequently, we affirm, on alternative grounds, the order denying defendants' motion to suppress the evidence obtained from the warrants as they relate to defendants. In doing so, we set forth guidelines for determining when tower dump warrants are lawful and what the State must do with information that is clearly not relevant to the specific crimes that were the subject of the warrants.

A-1399-24

I.

We discern the facts from the motion record. At approximately 9:30 a.m. on November 29, 2020, a man knocked on the door of an apartment on Park Avenue in South Plainfield.[1] A family of four lived in the apartment: a father, a mother, and two children, then eleven and three years of age.

The father opened the door and saw a man holding a black handgun with a red laser. That man was later identified as Hunter.

Hunter entered the apartment, struck the father twice with the handgun, and brought him into the bedroom. The mother and younger child were already in the bedroom. Shortly thereafter, the older child came into the bedroom. Hunter demanded money and searched for money. He took the parents' cell phones, an iPad, and a watch.

While Hunter was in the home, the adult victims heard Hunter make and receive several phone calls on his cell phone. One of those calls went to voicemail and one of the victims heard that the number being called began with 908-3. In another call, the father heard Hunter ask someone to come into the

_____

[1] To protect the identities of the victims, we do not use the specific address of the apartment. We note, however, that in applying for the warrants, the State appropriately used a specific address to limit the scope of the search.

4

house.  Shortly thereafter, a second individual, later identified as Bryant, entered the home.  Bryant was also armed with a handgun.

The family was then escorted into the living room.  Defendants again demanded money.  During the invasion, defendants told the adult victims that they knew there was money in the home.  At one point, Hunter took the mother into the bedroom and sexually assaulted her.  Thereafter, the defendants left the residence and took iPhones, iPads, $50 in cash, a watch, an Xbox, and a pair of AirPods from the victims.

The two adult victims suspected that Wayne Smith, the father of the mother, had been involved in the robbery.  They based that suspicion on the fact that Smith knew they had approximately $13,000 in cash in their home to be used as a deposit to purchase another home, Smith needed money and had previously requested a loan from the victims, and several days before the robbery, Smith had told the mother:  "You wouldn't want stuff stolen from you."  The mother interpreted that statement as a threat.  Additionally, during the invasion, the mother observed a receipt on the floor listing a town in New York.  The mother later learned that Smith had recently visited that town.  The adult victims provided all that information to the police.

5

A-1399-24

Law enforcement personnel also obtained video footage from surveillance cameras near the apartment. That footage showed a vehicle driving near the apartment on the morning of the invasion. Police were able to trace the vehicle and learned that it had been rented by Hunter. Those records also showed a cell phone number that police were able to associate with Hunter.

Additionally, the video footage showed a man approached the front door of the apartment at approximately 9:26 a.m., a second man approached the door at approximately 9:59 a.m., and two men left the apartment at approximately 10:53 a.m. and 10:59 a.m.

Nine days after the home invasion, on December 8, 2020, law enforcement personnel applied for and obtained four communication data warrants (CD warrants). The affidavit submitted in support of those warrants summarized the police investigation of the robbery and assault. In that regard, the affidavit described the invasion, the phone calls heard by the adult victims, that Wayne Smith was a suspect, and what law enforcement personnel had observed on the video footage from the surveillance cameras.

The affidavit requested four CD warrants to be served on T-Mobile USA, AT&T Mobility, Verizon Wireless, and Sprint Corporation. The affidavit sought data from cell-sites providing services to the address of the apartment

A-1399-24

and "any other cell site location facing and in close proximity to" the apartment. In terms of information, the affidavit requested all the providers' stored records, including the phone number, account number, account type, subscriber name, billing address, subscriber's social security number, subscriber's date of birth, and "all other account information for the said wireless telephone facility number(s)" for all cell phones that connected to the relevant cell towers between 9:15 a.m. and 11:00 a.m. on November 29, 2020.

That same day, a trial court judge authorized and issued four CD warrants to AT&T, Sprint, T-Mobile, and Verizon. As requested by the affidavit, the warrants directed each provider to produce to the State the following records:

> [R]ecords to include International Mobile Subscriber Identification (IMSI) numbers and Private ID Numbers, the numbers associated with the direct connect/dispatch service feature, the associated telephone facility numbers, and the obtaining of subscriber information and or customer records for all telephone facility numbers, IMSI numbers, and private ID numbers obtained, including but not limited to the Mobile Subscriber Integrated Services Digital Network (MSISDN), Mobile Identification Number (MIN), account number, account type, subscriber account name, billing address, subscriber's social security number, subscriber's date of birth, "can be reached" numbers, date account established, activation date, account status, Electronic Serial Number (ESN) or International Mobile Equipment Identity (IMEI) number, International Mobile Subscriber Identity (IMSI) number, cell site information for the period

7

requested, all other telephones on the same accounts, and all other account information for the said wireless telephone facility number(s) [obtained.]

In response to the warrants, the State received information about thousands of cell phone users who had been within several miles of the apartment at the time of the robbery and assault. The providers did not supply specific subscriber names, billing addresses, social security numbers, or dates of birth.

Before the State received the information from the providers, it separately obtained Smith's cell number and his corresponding cell phone records. Smith's records indicated that he had made or received phone calls during the time of the robbery. Once the responses to the CD warrants were received, Smith's information was cross-referenced and the State learned that a phone belonging to Hunter had contacted phones belonging to Smith and Bryant during the robbery. Additionally, the cell-site location information from Hunter's and Bryant's cell phones indicated that they were in or near the victims' apartment at the time of the robbery and assault.

As already noted, Hunter, Bryant, and Smith were then charged with multiple crimes, including robbery, conspiracy to commit robbery, and assault.

A-1399-24

Hunter, later joined by Bryant, moved to suppress the information obtained from the four CD warrants. The trial court heard oral arguments on that motion but did not conduct an evidentiary hearing. Instead, the trial court relied on the papers submitted by the parties, which included the warrants, the affidavit in support of the warrants, and an expert report submitted on behalf of defendants. The State did not dispute the information and data summaries set forth in defendants' expert report. In addition, the State submitted the transcript of the Grand Jury proceeding that resulted in the indictment against defendants.

Defendants' expert was Tom Beiser, a cellular forensic examiner and call detail records analyst. Beiser explained that his background included over eighteen years in law enforcement and "nearly two decades of experience in the fields of cell phone forensics[,] . . . cell phone records analysis[, and] mapping." Beiser summarized the data obtained by the State through the four CD warrants and calculated that the State had received information from approximately 10,477 cell phone users, from over twenty cell towers, and the information was collected from a 193.66 square miles search area.

On December 3, 2024, following oral argument, the trial court denied defendant's motion to suppress. In a short oral opinion, the court reasoned that the State's CD warrants were "narrowly tailored, particular, and supported by

9

probable cause." The trial court also determined that "[t]he search area was limited enough for [the trial court] and pointed towards the crime location on the day of the offense within the time frame when the suspects were in the victims' residence."

On Hunter's and Bryant's motion, we granted them leave to appeal from the trial court's December 3, 2024 order denying their motion to suppress.

II.

On appeal, defendants raise two primary arguments. First, they contend that all tower dump warrants are unconstitutional general warrants, which are per se illegal. In support of that argument, defendants assert that tower dump searches are inherently unparticularized and overbroad. Alternatively, they argue that these specific tower dump warrants were not particularized and were overbroad with respect to geographic scope and the information requested. Defendants then argue the warrants were defective because they failed to protect the privacy interests of third parties.

Specifically, defendants articulate their arguments as follows:

> THE TRIAL COURT INCORRECTLY UPHELD THESE UNPARTICULARIZED, OVERBROAD, GENERAL WARRANTS.
>
> A. Tower Dumps Are Unconstitutional General Warrants.

B.   The Tower Dumps in This Case Were Uniquely Unconstitutional.

THE SEARCH, WHICH OBTAINED THE PRIVATE INFORMATION OF THOUSANDS OF PEOPLE COMPLETELY UNINVOLVED WITH THE CRIME, WAS UNCONSTITUTIONAL.

A.   Th[ese] Tower Dump Warrant[s] [were] Overbroad, Insufficiently Particular, and Insufficiently Protective of the Information of Third Parties.

B.   Tower Dumps are Unconstitutional General Warrants.

C.   A Warrant Is Insufficient to Protect the Rights All New Jerseyans have to Free Association, to Free Speech, and to be Free of Unreasonable Searches and Seizures.

The American Civil Liberties Union (ACLU) and the ACLU of New Jersey filed an amicus brief in support of defendants' position.  The ACLU echoes defendants' concerns regarding tower dump searches in general, as well as the specific tower dump searches conducted in this case.

The State, in opposition, argues that tower dump searches are constitutional under both federal and state law, and that the tower dump warrants in this case were supported by probable cause and satisfied the particularity requirement.  The New Jersey Attorney General (AG) filed an amicus brief in

support of the State's position. In addition to agreeing with the State's arguments, the AG argues that defendants lack standing to contend that the tower dump warrants unconstitutionally intrude on the rights of third parties.

A.   Our Standard of Review.

"As a general matter, '[o]ur standard of review on a motion to suppress is deferential.'" State v. Courtney, 478 N.J. Super. 81, 90 (App. Div. 2024) (alteration in original) (quoting State v. Nyema, 249 N.J. 509, 526 (2022)). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." Ibid. (alteration in original) (quoting State v. Ahmad, 246 N.J. 592, 609 (2021)). As already pointed out, in this matter the trial court did not conduct an evidentiary hearing and it made limited factual findings based on the written submissions. Accordingly, we review the record to determine if the trial court's factual findings are supported by the submitted evidence. See Ahmad, 246 N.J. at 609 (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Moreover, in contrast to the deference afforded to a trial court's factual findings, an appellate court reviews legal conclusions de novo. State v. S.S., 229 N.J. 360, 380 (2017).

"It is well settled that a search executed pursuant to a warrant is presumed to be valid and that a defendant challenging its validity has the burden to prove that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable."  State v. Jones, 179 N.J. 377, 388 (2004) (internal quotation marks omitted).  In conducting that review, appellate courts grant substantial deference to the discretionary determination that resulted in the issuance of the search warrant.  Ibid. (quoting State v. Sullivan, 169 N.J. 204, 211-12 (2001)).

B.  The Searches and Seizures of Cell Tower Information.

In nearly identical language, the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  The "basic purpose" of that constitutional right "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  Carpenter v. United States, 585 U.S. 296, 303 (2018) (quoting Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967)).

13

1.    The Need For A Warrant.

The first issue we must determine is whether the State is required to obtain a warrant to acquire cell tower data.  Generally, a warrant, issued by a neutral magistrate, is required to conduct a lawful search and seizure.  See Coolidge v. New Hampshire, 403 U.S. 443, 449 (1971) (quoting Johnson v. United States, 333 U.S. 10, 13-14 (1948)); State v. Pineiro, 181 N.J. 13, 19 (2004); State v. Muldowney, 60 N.J. 594, 599-600 (1972).  So, unless the search is conducted under one of the limited exceptions allowing warrantless searches, a warrant must be obtained.  State v. Manning, 240 N.J. 308, 332 (2020).

A "tower dump" or "tower dump search" refers to an investigative technique where law enforcement officials obtain the records of all mobile devices that were connected to one or more specific cell towers during a particular time.  In those searches, government officials can obtain a large amount of personal and cell-site location data with the goal of identifying the suspect or suspects in a criminal investigation.  See, e.g., In re Application for Tel. Info. Needed for a Crim. Investigation, 119 F. Supp. 3d 1011, 1015, 1022 (N.D. Cal. 2015) (noting the volume of information obtained by cell phone records is substantial and can provide a wealth of information); In re Search of Info. Associated with Cellular Tel. Towers Providing Serv. to [Redacted] Stored

<u>Premises Controlled by Verizon Wireless</u>, 616 F. Supp. 3d 1, 8 (D.D.C. 2022) (pointing out this investigative technique can be critical for "prompt identification of a perpetrator").

Neither the United States Supreme Court nor the New Jersey Supreme Court has ruled on the constitutionality of cell tower "dump" searches or the need for warrants. Moreover, this court has not previously ruled on the constitutionality of cell tower dump searches or warrants. Accordingly, the constitutionality of tower dump searches is a matter of first impression in New Jersey.

While there is no governing precedent, numerous federal courts and several other state courts have addressed these issues.[2] The existing cases have analyzed the issues in varying depths and reached differing conclusions. Those cases generally fall into three categories: (1) cases reasoning that the searches do not require a warrant because they involved searches of information turned over to third parties—that is, the cellular service providers; (2) cases holding that requests for tower dumps require a warrant, but the warrants are lawful so

_____

[2] The following survey of cases is not exhaustive. The decisions cited are presented to illustrate the range of judicial approaches to analyzing tower dump searches. Moreover, with one exception, we have not cited to unpublished cases. <u>See</u> <u>R.</u> 1:36-3.

long as they are supported by probable cause and are particularized in what they seek; and (3) cases that hold the tower dumps and warrants seeking that information are unconstitutional as general warrants or non-specific searches.

Several courts have reasoned that searches of information from cellular towers do not require a warrant. See, e.g., United States v. Adkinson, 916 F.3d 605, 610-11 (7th Cir. 2019); United States v. Pricop, 775 F. Supp. 3d 1036, 1038-39 (D. Ariz. 2025); United States v. Williams, 741 F. Supp. 3d 642, 650-51 (E.D. Mich. 2024); Commonwealth v. Kurtz, 294 A.3d 509, 528-30 (Pa. Super. Ct. 2023); State v. Elias, 990 N.W.2d 905, 912-14 (Neb. 2023). For example, the United States Court of Appeals for the Seventh Circuit addressed a situation where several T-Mobile stores had been robbed. Adkinson, 916 F.3d at 608. T-Mobile conducted searches of its cellular towers near the robberies and identified defendant as a suspect. Ibid. T-Mobile then voluntarily gave the information to the Federal Bureau of Investigation (FBI). Ibid. The Seventh Circuit held that the searches were constitutional for several reasons, including that defendant had effectively consented to the disclosure of cell-site information obtained through the tower searches because T-Mobile was his cell phone provider. Id. at 610.

A-1399-24

In Kurtz, the Superior Court of Pennsylvania held that a defendant did not have a legitimate expectation of privacy in information obtained from a tower dump search that spanned a limited time and distance. 294 A.3d. at 530. Likewise, in Elias, the Nebraska Supreme Court held that a tower dump was not a governmental search because it was limited to the cell tower nearest to the crime scene and spanned only thirty minutes. 990 N.W.2d at 913-14; see also Pricop, 775 F. Supp. 3d at 1038-39 (holding that four tower dump warrants for cell towers servicing nine discrete locations were not "Fourth Amendment events" requiring probable cause); Williams, 741 F. Supp. 3d at 651 (holding that users had no reasonable expectation of privacy in cell phone records involved in a tower dump and probable cause was not required for the search).

The holdings in the first category of cases are primarily based on the third-party doctrine. The third-party doctrine reasons that if a person voluntarily gives information to a third party, like a telecommunications company, then that person has no reasonable expectation of privacy in the information. See Smith v. Maryland, 442 U.S. 735, 743-45 (1979); see also United States v. Miller, 425 U.S. 435, 443-44 (1976). We reject this line of cases because the New Jersey Supreme Court has consistently ruled that New Jersey will not adopt the third-party doctrine. See State v. Earls, 214 N.J. 564, 568 (2013) (citing State v. Reid,

A-1399-24

194 N.J. 386, 399 (2008)). In that regard, the Court has explained that "[u]nder settled New Jersey law, individuals do not lose their right to privacy simply because they have to give information to a third-party provider, like a phone company or bank, to get service." Ibid. The Court also explained: "New Jersey case law continues to be guided by whether the government has violated an individual's reasonable expectation of privacy." Ibid.

A second line of cases have held that tower dump searches require a warrant, but those warrants can be constitutional. See, e.g., United States v. Medina, 712 F. Supp. 3d 226, 245-46 (D.R.I. 2024), rev'd on other grounds, 125 F.4th 310 (1st Cir. 2025); Commonwealth v. Perry, 184 N.E.3d 745, 752 (Mass. 2022).

For example, in Medina, the court held that individuals have a reasonable expectation of privacy in all cell-site location information and, therefore, a search warrant based on probable cause was required to obtain that information. 712 F. Supp. 3d at 245-46. The Supreme Judicial Court of Massachusetts reached a similar conclusion in Perry. In Perry, the court reasoned that tower dump searches intrude on a defendant's reasonable expectation of privacy. 184 N.E.3d at 752. The court then held that tower dump searches are not "per se"

unconstitutional but rather may be used by law enforcement "so long as they comply with the warrant requirements." Ibid.

The Eighth Circuit, in United States v. James, also weighed in on this issue holding that three cell tower dump warrants related to a string of robberies were based on probable cause and sufficiently particular. 3 F.4th 1102, 1105-06 (8th Cir. 2021). Notably, however, the court did not address whether tower dump searches require a warrant. Ibid. See also Hudson v. State, 312 A.3d 615, 632-34 (Del. 2024) (upholding warrants seeking tower dump information as "sufficiently particular," but declining to address whether warrants were needed in the first place).

A third line of cases have ruled that cell tower dump warrants are general warrants, and therefore unconstitutional under the Fourth Amendment. See United States v. Spurlock, 778 F. Supp. 3d 1136, 1145 (D. Nev. 2025); In re Four Applications for Search Warrants Seeking Info. Associated with Particular Cellular Towers, No. 3:25-cr-38, 2025 WL 603000, at *7-8 (S.D. Miss. Feb. 21, 2025).[3] Both of those cases relied on a Fifth Circuit Court of Appeals case that

---

[3] We have cited this unpublished case because it is consistent with the published case and helps to illustrate that there is more than one case in the third category.

A-1399-24

held geofence warrants were unconstitutional.  See United States v. Smith, 110 F.4th 817, 837-38 (5th Cir. 2024). [4]

While these cases serve as persuasive authority, they are non-binding on this court.  See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79-80 (1990); State v. Weissman, 73 N.J. Super. 274, 281 (App. Div. 1962).  Having reviewed the non-binding cases from other jurisdictions, we are persuaded by the reasoning that tower dump searches can be constitutional, but they need a warrant, and the warrant must be particularized and supported by probable cause.  That approach is the most consistent with existing precedent in analogous circumstances.

Although neither the United States Supreme Court nor the New Jersey Supreme Court has directly addressed cell tower dump warrants, both those Courts have provided guidance on the need for warrants when obtaining information concerning cell phones.  In that regard, both Courts have held that

---

[4]  A "geofence warrant" is a warrant in which law enforcement specifies a location and period of time, and third-party companies conduct a sweeping search of their location databases to provide a list of all cell phone numbers and affiliated users found at or near a specific area during the provided timeframe.  Smith, 110 F.4th at 822.  The Fourth Circuit Court of Appeals reached the opposite conclusion and held that geofence warrants are constitutional under the Fourth Amendment.  United States v. Chatrie, 107 F.4th 319, 330-32 (4th Cir. 2024), aff'd en banc, 136 F.4th 100 (4th Cir. 2025), petition for cert. filed, No. 25-112 (July 30, 2025).

A-1399-24

people have a reasonable expectation of privacy in their cell phone location data. See Carpenter, 585 U.S. at 316; Earls, 214 N.J. at 569.

In Carpenter, police officials compelled Carpenter's wireless carrier to disclose his cell-site location information (CSLI), which tracked his movements over the course of several days and used that information to charge him with six counts of robbery. 585 U.S. at 302. The United States Supreme Court held that the government's acquisition of cell-site records was a search within the meaning of the Fourth Amendment. Id. at 316. The majority characterized its decision as a "narrow one," specifically declining to address the constitutionality of "tower dumps." Ibid. Nevertheless, the Court reasoned that the government had failed to appreciate that "there are no comparable limitations on the revealing nature of CSLI" to cases previously decided through the application of the third-party doctrine. Id. at 314.[5]

In Earls, the New Jersey Supreme Court considered "whether people have a constitutional right of privacy in cell-phone location information." 214 N.J.

---

[5] Justice Gorsuch, dissenting, directly addressed tower dumps and commented: "Why isn't a tower dump the paradigmatic example of 'too permeating police surveillance' and a dangerous tool of 'arbitrary' authority—the touchstones of the majority's modified Katz[v. United States, 389 U.S. 347 (1967)] analysis? On what possible basis could such mass data collection survive the Court's test while collecting a single person's data does not?" Carpenter, 585 U.S. at 396 (Gorsuch, J., dissenting) (emphasis omitted).

at 568.  In that matter, a police officer obtained an arrest warrant for Earls.  Id. at 571.  In an attempt to find Earls, the officer contacted T-Mobile, the service provider for a cell phone believed to be in Earls' possession.  Ibid.  Three times in one evening, T-Mobile provided information about the location of the cell phone via cell phone tower transmissions without a search warrant.  Ibid.  The New Jersey Supreme Court reversed a ruling denying Earls' motion to suppress the seizure of his cell phone location data.  Id. at 593.  The Court held that the police must obtain a warrant based on probable cause, or show an exception to the warrant requirement, to obtain tracking information from a cell phone.  Id. at 588.  The Court reasoned:

> Using a cell phone to determine the location of its owner can be far more revealing than acquiring toll billing, bank, or [i]nternet subscriber records.  It is akin to using a tracking device and can function as a substitute for 24/7 surveillance without police having to confront the limits of their resources.  It also involves a degree of intrusion that a reasonable person would not anticipate.
>
> [Id. at 586.]

The Court went on to observe,

> cell-phone use has become an indispensable part of modern life.  The hundreds of millions of wireless devices in use each day can often be found near their owners—at work, school, or home, and at events and gatherings of all types.

. . . .

> [C]ell phones are not meant to serve as tracking devices to locate their owners wherever they may be. People buy cell phones to communicate with others, to use the [i]nternet, and for a growing number of other reasons. But no one buys a cell phone to share detailed information about their whereabouts with the police.

> [Id. at 586-88.]

Applying the reasoning of Carpenter and Earls, we hold that government officials seeking information from cellular towers must first obtain a warrant, unless the circumstances involve one of the limited exceptions to a warrant requirement. We make this holding to clarify this evolving area of law concerning advancements in technology. See Earls, 214 N.J. at 588.

Our holding is based both on the Fourth Amendment and the New Jersey Constitution. Consequently, to the extent that federal law in the future might provide less protection, until the New Jersey Supreme Court rules differently, the New Jersey Constitution requires a search warrant to obtain cell-tower data. In that regard, it is well established that the protection against unreasonable searches and seizures under the United States and New Jersey Constitutions "are not always coterminous." State v. Hunt, 91 N.J. 338, 344 (1982). "On a number of occasions, [the New Jersey Supreme] Court has found that the State Constitution provides greater protection against unreasonable searches and

23

seizures than the Fourth Amendment." Earls, 214 N.J. at 584. That greater protection has been extended to data maintained by service providers. See Reid, 194 N.J. at 389 (recognizing a privacy interest in subscriber information given to an internet-service provider); State v. McAllister, 184 N.J. 17, 32-33 (2005) (recognizing a privacy interest of a bank account holder in their banking records); State v. Armstrong, 463 N.J. Super. 576, 589 (2020) (holding that persons have a strong expectation of privacy in their phone billing records) (citing State v. Mollica, 114 N.J. 329, 341-42 (1989)).

2. Standing To Address Third Parties' Constitutionality Concerns.

Defendants argue that cell tower dump searches violate the rights of all residents of New Jersey to be free from unreasonable searches and seizures, which in turn violates other constitutional rights, such as the rights to free association and free speech. The AG, as amicus curiae, asserts that defendants lack standing to raise arguments regarding the constitutional rights of third parties. We reject the AG's position for two reasons.

First, New Jersey has adopted broad standing rules, which afford a criminal defendant standing "to bring a motion to suppress evidence obtained in an unlawful search and seizure if he [or she] has a proprietary, possessory or participatory interest in either the place searched, or the property seized." State

v. Randolph, 228 N.J. 566, 581-82 (2017) (quoting State v. Alston, 88 N.J. 211, 228 (1981)).  Although a litigant may not ordinarily claim standing to assert the rights of third parties, "standing . . . is appropriate if the litigant can show sufficient personal stake and adverseness so that the [c]ourt is not asked to render an advisory opinion."  In re Est. of F.W., 398 N.J. Super. 344, 353 (App. Div. 2008) (alteration in original) (quoting Jersey Shore Med. Ctr.-Fitkin Hosp. v. Est. of Baum, 84 N.J. 137, 144 (1980)); Goldman v. Critter Control of N.J., 454 N.J. Super. 418, 424 (App. Div. 2018).  This is broader than the federal protection, which requires "a person alleging a Fourth Amendment violation . . . establish that law enforcement officials violated an expectation of privacy that he [or she] possessed in the place searched or item seized."  Randolph, 228 N.J. at 582 (quoting State v. Johnson, 193 N.J. 528, 542 (2008)).

Second, it is indisputable that the four CD warrants issued in this matter required AT&T, Sprint, T-Mobile, and Verizon to provide information about thousands of cell phone users.  The rights of those other users, therefore, were affected by the execution of the warrants, and if their constitutional rights are not addressed, those rights could evade judicial review.  See State v. Cassidy, 235 N.J. 482, 491 (2018) (holding the "far-reaching implications" of the use of blood alcohol testing machines for over 20,600 breath samples "undeniably"

25                                                A-1399-24

warrants judicial review); see also State v. Matrongolo, 479 N.J. Super. 8, 16-17 (App. Div. 2024) (determining eligibility to seek treatment through drug courts affected thousands of New Jersey citizens and was likely to recur, if not addressed).

Moreover, the concerns of third parties are not hypothetical. State v. Gartland, 149 N.J. 456, 464 (1997) (noting that the court will not exercise its jurisdiction in the abstract). Thousands of cell phone users' data was searched and turned over to the government without their knowledge that a seizure even occurred. Carpenter, 585 U.S. at 315 (noting that "a cell phone logs a cell-site record . . . without any affirmative act on the user's part beyond powering up").

In that regard, the Court in Earls noted several constitutional concerns with using cell phones as tracking devices, explaining:

> [The] disclosure of cell-phone location information, which cell-phone users must provide to receive service, can reveal a great deal of personal information about an individual. With increasing accuracy, cell phones can now trace our daily movements and disclose not only where individuals are located at a point in time but also which shops, doctors, religious services, and political events they go to, and with whom they choose to associate.
>
> [Id. at 568.]

The Court accordingly held that individuals have an expectation of privacy in cell phone location information that is cognizable under the New Jersey Constitution. Id. at 586. Since Earls, the expanding use of CD warrants has been a concern in privacy cases in New Jersey, and the use of CSLI data has become a powerful tool used by police in conducting criminal investigations. See State v. Missak, 476 N.J. Super. 302, 319 (App. Div. 2023) (noting the rising constitutional challenges posed by changing technology).

Applying the rationale of Earls, defendants have sufficient personal stakes to challenge the validity of the tower dump searches because the searches implicated their constitutional rights and produced information that led to the charges against them. Furthermore, defendants have standing to raise constitutional arguments regarding the collection of data from third parties because that information was obtained through the warrants issued in this matter. See State v. Gathers, 234 N.J. 208, 217 (2018) (choosing to resolve the constitutional question of whether a buccal swab DNA test in a simple possession case violated a criminal defendant's privacy rights) (citing Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330 (1996)).

A-1399-24

3.    The CD Warrants in this Matter.

To be valid, a warrant must be supported by probable cause and must be particularized in identifying the searches to be conducted. Zurcher v. Standford Daily, 436 U.S. 547, 565 (1978); Facebook, Inc. v. State, 254 N.J. 329, 340 (2023). Thus, the New Jersey Constitution states: "no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized." N.J. Const. art. I, ¶ 7. The United States Constitution uses nearly identical language to require warrants to be supported by probable cause and to be particular. U.S. Const. amend. IV.

"Before issuing a warrant, the judge must be satisfied that there is probable cause to believe that a crime has been committed, or is being committed, at a specific location or that evidence of a crime is at the place sought to be searched." Sullivan, 169 N.J. at 210. "Probable cause for the issuance of a search warrant requires 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" Gathers, 234 N.J. at 223 (quoting State v. Chippero, 201 N.J. 14, 28 (2009)).

The particularity requirement mandates that "the description is such that the officer with a search warrant can with reasonable effort ascertain and

identify the place intended [to be searched]." State v. Marshall, 199 N.J. 602, 611 (2009) (quoting Steele v. United States, 267 U.S. 498, 503 (1925)). The purpose of the particularity requirement is to prevent "general" and "wide-ranging exploratory searches." Ibid. (quoting Maryland v. Garrison, 480 U.S. 79, 84 (1987)). "Thus, the scope of a lawful search is defined by the object of the search and the place in which there is probable cause to believe that it may be found." Ibid.

In their second argument, defendants contend that the four tower dump searches in this matter were not particularized and were overbroad. Moreover, they contend that the CD warrants invaded the privacy interests of thousands of third parties.

In applying for the CD warrants, the State requested AT&T, Sprint, T-Mobile, and Verizon to supply a wide range of information, including the cell numbers, account numbers, account types, subscriber names, billing addresses, subscriber social security numbers, subscribers' date of birth, and "all other account information for the said wireless telephone facility number[s]" for all cell phones that connected to certain cellular towers between 9:15 a.m. and 11:00 a.m. on November 29, 2020. The CD warrants directed the wireless carriers to provide data from "[c]ell site[s] providing service to the location[s]

listed below and any other cell site location facing and in close proximity to [an identified street in] South Plainfield, N.J. 07080."

The trial court determined that the warrants were "narrowly tailored, particular, and supported by probable cause." Those determinations regarding the warrants' scope and particularity are not supported by the record. Indeed, a review of the CD warrants establishes that they were not sufficiently particularized. In response to the CD warrants, the State received information from approximately 10,477 cell phone users.

There was no probable cause to believe that thousands of individual cell phone users were involved in the home invasion, robbery, and sexual assault that took place at a particular apartment on November 29, 2020. See State v. Sims, 75 N.J. 337, 345 (1978) (holding that a search warrant for unnamed persons must be particularized to distinguish the subjects of the search from the general public). The State in its application, and the trial judge in issuing the CD warrants, should have recognized that the warrants were overbroad. Information from over ten thousand individual cell phone users was collected in connection with an investigation of a crime where the police were looking for two perpetrators and a co-conspirator.

30

Additionally, the CD warrants in this matter were not particularized as to the subscriber information requested. The warrants on their face requested a broad array of subscriber information. In that regard, the warrants required the providers to turn over information that included subscriber names, billing addresses, subscriber social security numbers, and subscribers' dates of birth. While the wireless carriers did not produce all the requested information, the CD warrants required the information to be turned over, and the State could have demanded the additional information be produced. So, the CD warrants overstepped the constitutional bounds of a reasonable search and seizure. See Garrison, 480 U.S. at 84 (explaining that "[t]he manifest purpose of this particularity requirement was to prevent general searches. . . . [T]he requirement ensures that the search will be carefully tailored to its justifications[.]"). Indeed, the AG conceded that the scope of the CD warrants in this matter was "problematic" because they sought expansive subscribers' "identifying information."

Regarding the geographic area, the State did not attempt to tailor its request to specific cell towers. Instead, the State requested data from all "cell sites providing service to . . . and any other cell-site location facing and in close

31

proximity to" the crime scene. As a result, the State received information from over twenty cell towers covering a range of over 193 square miles.

Accordingly, we hold that the four CD warrants issued in this matter violated both the United States and New Jersey Constitutions because they were not particularized and they were overbroad with respect to the expansive information requested. Having reached that conclusion, we must address (1) whether the information concerning defendants would have inevitably been discovered; and (2) the remedy for the constitutional seizure of information from innocent third parties.

III.

The inevitable discovery doctrine may be invoked to preserve "the admissibility of evidence obtained without a warrant or a valid exception to the warrant requirement." State v. Camey, 239 N.J. 282, 301 (2019). When "the evidence in question would inevitably have been discovered without reference to the police error or misconduct," thereby negating any taint, the inevitable discovery doctrine allows for its admissibility. State v. Sugar, 108 N.J. 151, 156 (1987) (quoting Nix v. Williams, 467 U.S. 431, 448 (1984)); accord State v. Maltese, 222 N.J. 525, 551-52 (2015). To apply the exception, the State must prove the following by clear and convincing evidence:

(1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.

[Maltese, 222 N.J. at 552 (quoting State v. Johnson, 120 N.J. 263, 289 (1990)).]

At oral argument we directed defendants and the State to file supplemental briefs addressing whether the inevitable discovery doctrine applied and was an alternative ground for affirming the order denying defendants' motion to suppress all information obtained from the CD warrants. Defendants responded by arguing the State waived the argument by not raising it before the trial court and the State cannot meet its burden of showing that the doctrine applies. They also contend that, at a minimum, the matter should be remanded, and the State should have to present clear and convincing evidence that it would have inevitably discovered the information through lawful means.

The State responded that it would have lawfully discovered the information concerning Hunter and Bryant. Indeed, they submitted additional affidavits showing they had obtained additional warrants for information related to cell phones associated with Hunter, Bryant, and Smith. So, the State contends

33

that information related to those defendants', including CSLI information, should not be suppressed.

The undisputed facts in the record establish each of the criteria for application of the inevitable discovery doctrine. Therefore, we see no reason for a remand because the existing record established by clear and convincing evidence that cell data and related information concerning defendants would have been, and indeed was, discovered independent of the four CD warrants issued on December 8, 2020.

The State had information that one of the robbers contacted Smith during the robbery. The State therefore obtained a warrant to seize and search Smith's cell phone. No defendant has challenged that warrant. With Smith's cell phone number, the State could have applied for and obtained a warrant for cellular tower searches to identify all cell phone numbers that connected to Smith's cell phone during the robbery. The information from that search would have identified Hunter and his cell phone number. With Hunter's cell phone number, the State could have applied for and obtained a second warrant for cellular tower searches to identify any cell phone that connected to Hunter's cell phone during the robbery. The information from that search would have revealed Bryant through his cell phone number.

In addition, the independent source doctrine provides another basis for not suppressing defendant's cell records. Under this doctrine, if the police would have obtained the information through an independent source, then the information will not be suppressed even if it was originally obtained through a defective warrant. See State v. Smith, 212 N.J. 365, 395-96 (2012) (holding that because the police could have independently, through their normal course of investigation, obtained a separate warrant for one suspect's records, a defective affidavit as to another defendant did not require suppression of his records).

The State has established it obtained separate warrants that collected information about defendants' cell phones and their locations during the robbery and assault. Consequently, there were independent sources. Indeed, the constitutional flaw with the CD warrants issued on December 8, 2020, was that they sought information beyond defendants' cell phones and needlessly swept up data from thousands of other cell phone users.

Given that the relevant facts are established in the current record, we hold that the State would have inevitably, or alternatively, independently, and lawfully identified Hunter and Bryant. Consequently, we affirm the order denying their motion to suppress the information from the four CD warrants that were issued as to information concerning Hunter, Bryant, and Smith.

## IV.

Finally, we address the remedy for the overbroad searches and seizures. Any warrant authorizing a cellular tower dump is almost certainly going to collect information about people who are not suspects in the crimes being investigated. Those individuals have a right to know that the government cannot hold their information once it is clear that they were not involved in the crimes.

Accordingly, several courts have imposed protocols requiring the government to promptly and permanently dispose of data concerning innocent third parties. See Perry, 184 N.E.3d at 770-71 (requiring a warrant to include protocols for the "prompt and permanent disposal of any and all data that does not fit within the object of the search"); In re the Application of the United States for an Order Pursuant to 18 U.S.C. §§ 2703(c) & 2703(d), 42 F. Supp. 3d 511, 519 (S.D.N.Y. 2014) (directing that orders for tower dumps must "outline[] a protocol to address how the [g]overnment will handle the private information of innocent third-parties whose data is retrieved"); In re Search of Cellular Tel. Towers, 945 F. Supp. 2d 769, 771 (S.D. Tex. 2013) (ruling that the government must return all original records and copies to the provider of cellular information obtained through a tower dump warrant after the information is determined not to be relevant to the criminal matter under investigation).

A-1399-24

In this matter, the State does not dispute that through the CD warrants it received information from 10,474 cell phone users who were not involved in the robbery and assault that took place on November 29, 2020. Consequently, the State now has information concerning the locations and the uses of cell phones from thousands of individuals who were not involved in the crimes. If the State was to maintain and use that information in the future, the constitutional rights of those users would be violated because the CD warrants were not supported by probable cause concerning them, nor were the warrants particularized as to them. See In re Search of ODYS LOOX Plus Tablet, 28 F. Supp. 3d 40, 45 (D.D.C. 2014) (reasoning "[t]he government cannot keep data that is outside the scope of the warrant . . . [and] that data must be either returned or destroyed"). In short, it would be improper for the State to retain the data related to innocent third parties once the data is no longer required for, or subject to discovery in, the criminal proceedings.

We, therefore, direct that at the appropriate time the State must delete and cannot retain information about the third-party users in this case. We acknowledge that the State has obligations to maintain evidence while a case is pending and during the appeal process. See State v. M.B., 471 N.J. Super. 376, 382-83 (App. Div. 2022) (stating the State has an obligation to "preserve

evidence consistent with the strictures of the Fourth Amendment" pursuant to State retention policies); see also N.J. Attorney Gen. Dep't of Law and Pub. Safety and the N.J. Prosecutor's Ass'n Directive No. 2011-1, Attorney Gen. Guidelines for the Retention of Evidence (January 6, 2011). Moreover, defendants have rights to be notified and heard before evidence is deleted. See California v. Trombetta, 467 U.S. 479, 487 (1984) (recognizing that prosecutors have a duty to preserve evidence under the Fourteenth Amendment); State v. Hollander, 201 N.J. Super. 453, 479 (1985) (explaining that a criminal defendant's due process rights may be violated if evidence is destroyed); R. 3:13-3(b) (stating defendants have rights to broad discovery that attaches after indictment). Subject to those rights, the State must delete information it obtains through the CD warrants concerning third-party users.

If the State believes that it needs to maintain any third-party information beyond the appeal period, it must apply to the court overseeing the criminal matter and obtain an order allowing the retention of that information. That order must be supported by a written or oral decision explaining why the State can maintain that information, for what purposes the State can use that information, and for how long the State can maintain the information.

In summary, we hold the four CD warrants issued on December 8, 2020, were unconstitutional. We affirm the order denying defendants' motion to suppress the information concerning them, on the alternative grounds that the information would have inevitably been discovered or would have been discovered from independent sources. We remand with direction that the trial court enter an order directing the State to delete and not maintain information it received through the CD warrants regarding innocent third parties.

Affirmed on alternative grounds and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1399-24